729 F.2d 1185
 The BLACKFEET TRIBE OF INDIANS, Plaintiff-Appellant,
v.
William A. GROFF, Director, Montana, Department of Revenue,
State of Montana; Glacier County, Montana; and
Pondera County, Montana, Defendants-Appellees.
 No. 81-3041.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 3, 1982.
Decided Dec. 14, 1982.
Opinion Withdrawn. For En Banc Opinion see 729 F.2d 1192.
 
 Richard B. Collins, Boulder, Colo., for plaintiff-appellant.
 Douglas Anderson, Conrad, Mont., argued, Helena S. Maclay, Missoula, Mont., Allen B. Chronister, Asst. Atty. Gen., Helena, Mont., Bruce McEvoy, Kalispell, Mont., Deirdre Boggs, Missoula, Mont., on brief, for defendants-appellees.
 On Appeal from the United States District Court for the District of Montana.
 Before SNEED, ANDERSON, and REINHARDT, Circuit Judges.
 J. BLAINE ANDERSON, Circuit Judge:
 
 
 1
 The Blackfeet Tribe of Indians (the "Tribe") filed suit seeking equitable relief against state taxation of oil and gas production undertaken by the Tribe's non-Indian lessees on the Blackfeet Reservation. Named as defendants were William Groff as Director of the Montana Department of Revenue, the State of Montana, Glacier County, Montana, and Pondera County, Montana (all simply the "State"). The district court, the Honorable Paul G. Hatfield presiding, granted the State's motion for summary judgment.[1] We affirm.
 
 I. BACKGROUND
 
 2
 The Blackfeet Tribe, under the supervision of the Department of the Interior, is the lessor of 125 parcels of tribal land for oil and gas mining purposes. The Tribe is the beneficial owner of the mineral rights in issue. The United States holds the legal title in trust for the Tribe. The lessees (or "producers") are not Indian or Indian-owned entities. The Tribe receives royalty payments based on the amount of oil and gas produced. Oil and gas leasing on the reservation began in 1932 and has continued until the recent past.
 
 
 3
 Four Montana taxing statutes are at issue.[2] One has been in force at all times relevant to this action. Two were enacted in the 1970's and the other in 1953. All four statutes tax different aspects of the production of the oil and gas extracted by the non-Indian lessees. The Tribe admits it has not paid any of these taxes directly to the State; the producers have paid the taxes. The Tribe asserts, however, that the producers have deducted the Tribe's share of taxes from the royalty payments.
 
 
 4
 The Tribe brought this action in 1978. Both the Tribe and the State moved for summary judgment. The district court granted summary judgment in favor of the State.
 
 II. DISCUSSION
 
 5
 District Judge Hatfield based his grant of summary judgment on the belief the 1924 Act authorized state taxation of reservation oil and gas production; because the 1924 Act authorized the taxes at issue, it was unnecessary to reach the issue of whether the legal incidence of the tax is on the Tribe. The Tribe argues on appeal that the 1924 Act is no longer in effect and the incidence of the tax adversely impacts its inherent right of sovereignty. As this appeal is from a summary judgment, our review is the same as that of the trial court. National Industries, Inc. v. Republic National Life Ins. Co., 677 F.2d 1258, 1265 (9th Cir.1982). Few, if any, facts are in dispute. Virtually all issues are legal and involve the often difficult questions of jurisdiction in Indian Country.
 
 A. Congressional Authorization to Tax
 
 6
 A state's power to tax transactions arising in Indian Country is severely limited. This is especially true when Indian interests are affected. Thus, it was early established that the states could not tax Indian trust property. The Kansas Indians, 72 U.S. (5 Wall.) 737, 18 L.Ed. 667 (1867). More recently, it has been held that the states may not tax the income earned by tribal members on the tribe's reservation, McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), the personal property of tribal members, Bryan v. Itasca County, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), or sales involving tribal members, Moe v. Confederated Salish and Kootenai Tribes, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), and Washington v. Confederated Tribes of the Colville Reservation, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980).
 
 
 7
 State jurisdiction over the affairs of non-Indians in Indian Country often presents more difficult issues. Such jurisdiction must usually be analyzed in terms of federal preemption and/or the Tribe's limited right of sovereignty. White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665, 672 (1980). If the state taxation of non-Indians in Indian Country is not preempted, Warren Trading Post Co. v. Arizona Tax Commission, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), it may be upheld if the state's interest in taxing the non-Indians is substantial and outweighs the sovereignty interest of the tribe. See Confederated Colville Tribes, supra, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10.
 
 
 8
 The major exception to the limited power of the states to tax Indian or non-Indian interests in Indian Country is when there is an express authorization by Congress for the tax. See Bryan v. Itasca County, supra, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710, and McClanahan v. Arizona State Tax Commission, supra, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129. The district judge found, and the State argues, such authorization exists. Our task, then, is to determine whether Congress has evinced its consent to the taxes at issue.
 
 
 9
 We have little difficulty finding such consent in the Act of May 29, 1924, 43 Stat. 244 (the "1924 Act"). This statute, currently codified at 25 U.S.C. Sec. 398, amended the Act of February 28, 1891, 26 Stat. 795, 25 U.S.C. Sec. 397.[3] The 1891 Act authorized the leasing of tribal property for grazing and mining purposes, within certain specified regulations. The 1924 Act includes a specific procedure for oil and gas leasing and provides in part:
 
 
 10
 That the production of oil and gas and other minerals on such lands may be taxed by the state in which said lands are located in all respects the same as production on unrestricted lands, and the Secretary of the Interior is authorized and directed to cause to be paid the tax so assessed against the royalty interests on said lands....
 
 
 11
 The 1924 Act's authorization of state taxation of oil and gas production and net proceeds under tribal leases on the Blackfeet Reservation was upheld in British-American Oil Prod. Co. v. Board of Equalization of Montana, 299 U.S. 159, 57 S.Ct. 132, 81 L.Ed. 95 (1936).
 
 B. Effect of the Act of 1938
 
 12
 The Tribe contends the 1924 Act's tax authorization was abrogated by the Act of May 11, 1938, 52 Stat. 347, codified at 25 U.S.C. Secs. 396a-396g (the "1938 Act").[4] The 1938 Act did not expressly repeal the 1924 Act.[5] While we recognize the 1938 Act was an attempt to provide uniformity in an area which has been described as a "patch-work state," F. Cohen, Handbook of Federal Indian Law, 328 (1942 Ed.), we cannot agree with the Tribe that this act impliedly repealed the 1924 Act's tax authorization.[6]
 
 
 13
 At the outset, we note the opinion in Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), while not dispositive, offers support for our conclusion the 1938 Act did not repeal the 1924 Act. In Merrion, the Court upheld the right of the Jicarilla Apache Tribe to tax oil and gas production on its reservation. New Mexico had in existence its own oil and gas production taxes pursuant to the Act of March 3, 1927, 44 Stat. 1347, 25 U.S.C. Secs. 398a-e. The 1927 Act's main purpose was to extend the 1924 Act's coverage to executive order reservations. See, F. Cohen, Handbook of Federal Indian Law, 534 (1982 Ed.) The Court noted in Merrion that it was not deciding the issue whether the state could tax oil and gas production through leases entered under the 1938 Act. 455 U.S. at 151, fn. 17, 102 S.Ct. at 909, fn. 17, 71 L.Ed.2d at 38, fn. 17. Nonetheless, the Court treated the 1927 and 1938 Acts as a composite whole and made no indication the state lacked the authority to tax. We believe a similar analysis should apply to the 1924 and 1938 Acts.
 
 
 14
 The 1938 Act attempts to make uniform the law governing the leasing of tribal (unallotted) lands for mineral purposes. Letter from Charles West, Acting Secretary of the Interior, to the House Committee on Indian Affairs, June 17, 1937, reprinted in H.R.Rep. No. 1872, 75th Cong., 3d Sess. (1938); S.Rep. No. 985, 75th Cong., 1st Sess. (1937). It does so by regulating the leasing of all minerals, not solely certain types of mineral leasing. 25 U.S.C. Sec. 396a. It also regulates the procedures for entering a lease and allows the Department of Interior to issue rules to that effect. 25 U.S.C. Sec. 396d. The legislative history also makes it clear the 1938 Act was designed to further the purposes of the Indian Reorganization Act of 1934, 25 U.S.C. Secs. 461-479. Letter from Charles West, supra. The Reorganization Act was quite clearly an effort to reverse the assimilation policies of the Allotment Acts and to encourage Indian self-government. See Fisher v. District Court, etc., 424 U.S. 382, 387, 96 S.Ct. 943, 946, 47 L.Ed.2d 106, 111 (1976). The 1938 Act furthers these goals by giving tribes more control over the decisions to lease and by streamlining the leasing process to secure a higher economic return to the tribes.
 
 
 15
 Against the policy and scope of the 1938 Act, we must balance the long-recognized rule that repeals by implication are strongly disfavored. Morton v. Mancari, 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290, 300 (1974); Posadas v. National City Bank, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351, 355 (1936). As explained by the Supreme Court in Posadas:
 
 
 16
 There are two well-settled categories of repeal by implication--(1) where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act. But in either case, the intention of the legislature to repeal must be clear and manifest ....
 
 
 17
 296 U.S. at 503, 56 S.Ct. at 352, 80 L.Ed. at 355 (Emphasis added).
 
 
 18
 We see no "irreconcilable conflicts" in the language of the 1924 Act and the 1938 Act. There is no doubt the two statutes are capable of coexistence. The 1938 Act primarily uses and expands the oil and gas leasing procedures outlined in the 1924 Act and applies them to all leases. Section 1 of the 1938 Act, 25 U.S.C. Sec. 396a, reiterates much of the language of the 1924 Act regarding tribal council consent, BIA approval, and a general ten-year durational limit on the leases. Section 2 of the 1938 Act, 25 U.S.C. Sec. 396b, expands on the 1924 Act's public auction requirements. The 1938 Act is silent regarding taxation. The language of the statutes does not evince a clear indication that repeal of the taxing authorization was intended. On its face, taxation of oil and gas production is quite compatible with the 1938 Act.
 
 
 19
 Nor does the legislative history supply the necessary showing of intent. It is true, as the Tribe argues and we have noted, the 1938 Act was an effort to make uniform the leasing laws and to bring them into harmony with the policies of the Indian Reorganization Act. The terms of the 1938 Act make it evident, however, it was the intent of Congress to supply uniformity by placing the leasing of mineral rights other than oil and gas within a statutory framework similar to that provided for in the 1924 Act. See Letter from Charles West, supra. Also, to bring leasing into harmony with the Reorganization Act, the drafters of the 1938 Act attempted to create a system which would provide the tribes with the "greatest return on their property." Id. Apparently, the drafters of the bill believed the new act would streamline the leasing process and thereby increase the availability of leases for all types of minerals.[7] The streamlined process, however, was substantially derived from the 1924 Act. Neither the language of the statute nor the legislative history persuades us that there is an irreconcilable conflict or repugnancy between the 1924 and 1938 Acts.
 
 
 20
 The only possible conflict between the 1924 and the 1938 Acts involves the Reorganization Act's self-determination and self-sufficiency policies. Arguably, these policies conflict with the continued authorization of state taxation which might tend to reduce tribal income. This possible conflict, however, must be viewed in light of another Reorganization Act policy which was the desire to encourage tribes "to enter the white world on a footing of equal competition." Statements of Rep. Howard, 78 Cong.Rec. 11732, quoted in Mescalero Apache Tribe v. Jones, 411 U.S. 145, 152, 93 S.Ct. 1267, 1272, 36 L.Ed.2d 114, 121 (1973); see also Fort Mojave Tribe v. San Bernardino County, 543 F.2d 1253, 1256 (9th Cir.1976), cert. denied, 430 U.S. 983, 97 S.Ct. 1678, 52 L.Ed.2d 377 (1977). State taxation is one of the realities of an equal footing. We do not believe this possible policy conflict rises to the level of irreconcilability required to constitute an implicit repeal.[8]
 
 
 21
 Even though the 1938 Act is a more comprehensive and general statute than the 1924 Act, a fact which sometimes will lead to a finding of an implied repeal of the earlier act, Posadas, supra, 296 U.S. at 503, 56 S.Ct. at 352, 80 L.Ed. at 355, we still do not find there to be the requisite conflict. This conclusion is supported by the rule that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one regardless of the priority of enactment." Morton, supra, 417 U.S. at 550-551, 94 S.Ct. at 2482-2483, 41 L.Ed.2d at 301.
 
 
 22
 The Tribe argues the canon of construction which provides that ambiguities in statutes are to be resolved in favor of the Indians applies to this case. See, e.g., Bryan v. Itasca County, supra, 426 U.S. at 392, 96 S.Ct. at 2112, 48 L.Ed.2d at 723. We cannot agree. The 1924 Act's tax authorization is unambiguous. This "canon of construction is not a license to disregard clear expressions of ... congressional intent." DeCoteau v. District County Court, 420 U.S. 425, 447, 95 S.Ct. 1082, 1094, 43 L.Ed. 300, 315 (1975); Andrus v. Glover, 446 U.S. 608, 619, 100 S.Ct. 1905, 1911, 64 L.Ed.2d 548, 558 (1980). Nor does the 1938 Act create any ambiguity. It is silent on the repeal of the 1924 Act. The Tribe's use of this canon of construction would have us amend the 1938 Act to include an express repeal of the 1924 Act. That, however, would be going beyond a liberal interpretation of an ambiguous clause or phrase to the point of judicial legislating. This we will not do. See Fry v. United States, 557 F.2d 646, 649 (9th Cir.1977), cert. denied, 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 754 (1978).
 
 
 23
 Additionally and perhaps most importantly, there has been a long-term administrative interpretation upholding the right of states to tax oil and gas production on the reservations notwithstanding the silence of the 1938 Act. This, outside compelling reasons otherwise, is sufficient to support the continued validity of the 1924 Act. See Assiniboine & Sioux Tribes v. Nordwick, 378 F.2d 426, 432 (9th Cir.1967), cert. denied, 389 U.S. 1046, 88 S.Ct. 764, 19 L.Ed.2d 838 (1968); Baur v. Mathews, 578 F.2d 228, 233 (9th Cir.1978); Castillo-Felix v. Immigration and Naturalization Service, 601 F.2d 459, 465 (9th Cir.1979). Beginning in 1943, the Department of Interior interpreted the 1924 Act to be of continued effectiveness despite the 1938 Act. Several supporting interpretations were made until a contrary interpretation was issued in 1977. See 84 Interior Dec. 905 (1977) and its references to the prior opinions. Generally, the construction of a statute by the agency charged with its administration is entitled to great weight, especially when, as here, Congress has refused to alter the administrative interpretation. Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371, 384 (1969). The contrary interpretation by the Solicitor of the Department of Interior in 1977 does not change the result in this case. Unless the original interpretation of the statute by the Department was clearly wrong, which we do not believe to be true, it is not appropriate for the Department to reverse its long held construction of a statute. See United States v. Leslie Salt Co., 350 U.S. 383, 396, 76 S.Ct. 416, 423, 100 L.Ed. 441, 451 (1956); Power Brake Equipment Company v. United States, 427 F.2d 163, 164 (9th Cir.1970); Red Lion, supra, 395 U.S. at 381, 89 S.Ct. at 1801, 23 L.Ed.2d at 384. Furthermore, the presumption against repeal by implication, the long and consistent interpretation by the Department of Interior, and congressional acquiescence in that interpretation all lead to the conclusion the 1977 opinion is erroneous.
 
 
 24
 We hold, then, that the 1924 Act and its authorization to tax reservation oil and gas production was not implicitly repealed by the 1938 Act.
 
 C. Leases Under the 1938 Act
 
 25
 The Tribe contends that even if the 1924 Act is not found to be repealed by the 1938 Act, 113 of the leases in question were entered pursuant to the 1938 Act; therefore, the 1938 Act controls and it does not contain an authorization to tax. For the following reasons, we reject this argument.
 
 
 26
 Most, if not all, of what has been said concerning the implied repeal of the 1924 Act applies with equal force to the Tribe's contention. Having found the 1924 Act to still be in force, we would be remiss to find it lacked any effect. "When two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." Morton, supra, 417 U.S. at 552, 94 S.Ct. at 2483, 41 L.Ed.2d at 301; Radzanower v. Touche Ross & Co., 426 U.S. 148, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976).
 
 
 27
 Furthermore, the fact the leases were made pursuant to the 1938 Act does not affect the State's power to tax. The critical aspect is the State's authorization to tax, not the statute under which the leases were made. In any event, both statutes purport to regulate leasing on the same lands--unallotted reservation property.[9] It is not a strain on our reasoning to find the two acts have a concurrent, cumulative, and compatible effect. We hold, therefore, the 1924 Act's taxing authorization applies with equal force to leases made pursuant to the 1938 Act.
 
 III. CONCLUSION
 
 28
 We find the 1924 Act to permit Montana to tax oil and gas production on the Blackfeet Reservation. The 1938 Act did not impliedly repeal the 1924 Act and its authorization for the taxes at issue.
 
 
 29
 The decision of the district court is AFFIRMED.[10]
 
 
 
 [1]
 The district court opinion is reported at 507 F.Supp. 446 (D.Mont.1981)
 
 
 [2]
 The Montana taxing statutes are:
 (1) The Oil and Gas Conservation Tax, Sec. 82-11-131, M.C.A. (formerly Sec. 60-145, R.C.M.1947);
 (2) The Resource Indemnity Trust Tax, Sec. 15-38-104, M.C.A. (formerly Sec. 84-7006, R.C.M.1947);
 (3) The Oil and Gas Severance Tax, Sec. 15-36-101, M.C.A.
 (4) The Oil and Gas Net Proceeds Tax, Sec. 15-23-601, et seq., M.C.A. (formerly Sec. 84-6201, et seq., R.C.M.1947).
 
 
 [3]
 The 1891 Act provides:
 SEC. 3. That whenever it shall be made to appear to the Secretary of the Interior that, by reason of age or other disability, any allottee under the provisions of said act, or any other act or treaty can not personally and with benefit to to himself occupy or improve his allotment or any part thereof the same may be leased upon such terms, regulations and conditions as shall be prescribed by such Secretary, for a term not exceeding three years for farming or grazing, or ten years for mining purposes: Provided, That where lands are occupied by Indians who have bought and paid for the same, and which lands are not needed for farming or agricultural purposes, and are not desired for individual allotments, the same may be leased by authority of the Council speaking for such Indians, for a period not to exceed five years for grazing, or ten years for mining purposes in such quantities and upon such terms and conditions as the agent in charge of such reservation may recommend, subject to the approval of the Secretary of the Interior.
 The 1924 Act states in full:
 Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That unallotted land on Indian reservations other than lands of the Five Civilized Tribes and the Osage Reservation subject to lease for mining purposes for a period of ten years under the proviso to section 3 of the Act of February 28, 1891 (Twenty-sixth Statutes at Large, page 795), may be leased at public auction by the Secretary of the Interior, with the consent of the council speaking for such Indians, for oil and gas mining purposes for a period of not to exceed ten years, and as much longer thereafter as oil or gas shall be found in paying quantities, and the terms of any existing oil and gas mining lease may in like manner be amended by extending the term thereof for as long as oil or gas shall be found in paying quantities: Provided, That the production of oil and gas and other minerals on such lands may be taxed by the State in which said lands are located in all respects the same as production on unrestricted lands, and the Secretary of the Interior is hereby authorized and directed to cause to be paid the tax so assessed against the royalty interests on said lands: Provided, however, That such tax shall not become a lien or charge of any kind or character against the land or the property of the Indian owner.
 
 
 [4]
 The 1938 Act provides:
 Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That hereafter unallotted lands within any Indian reservation or lands owned by any tribe, group, or band of Indians under Federal jurisdiction, except those hereinafter specifically excepted from the provisions of this Act, may, with the approval of the Secretary of the Interior, be leased for mining purposes, by authority of the tribal council or other authorized spokesmen for such Indians, for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities.
 SEC. 2. That leases for oil- and/or gas-mining purposes covering such unallotted lands shall be offered for sale to the highest responsible qualified bidder, at public auction or on sealed bids, after notice and advertisement, upon such terms and subject to such conditions as the Secretary of Interior may prescribe. Such advertisements shall reserve to the Secretary of the Interior the right to reject all bids whenever in his judgment the interest of the Indians will be served by so doing, and if no satisfactory bid is received, or the accepted bidder fails to complete the lease, or the Secretary of the Interior shall determine that it is unwise in the interest of the Indians to accept the highest bid, said Secretary may readvertise such lease for sale, or with the consent of the tribal council or other governing tribal authorities, a lease may be made by private negotiations: Provided, That the foregoing provisions shall in no manner restrict the right of tribes organized and incorporated under sections 16 and 17 of the Act of June 18, 1934 (48 Stat. 984), to lease lands for mining purposes as therein provided and in accordance with the provisions of any constitution and charter adopted by any Indian tribe pursuant to the Act of June 18, 1934.
 SEC. 3. That hereafter lessees of restricted Indian lands, tribal or allotted, for mining purposes, including oil and gas, shall furnish corporate surety bonds in amounts satisfactory to the Secretary of the Interior, guaranteeing compliance with the terms of their leases: Provided, That personal surety bonds may be accepted where the sureties deposit as collateral with the said Secretary of the Interior any public-debt obligations of the United States guaranteed as to principal and interest by the United States equal to the full amount of such lands or other collateral satisfactory to the Secretary of the Interior, or show ownership to unencumbered real estate of a value equal to twice the amount of the bonds.
 SEC. 4. That all operations under any oil, gas, or other mineral lease issued pursuant to the terms of this or any other Act affecting restricted Indian lands shall be subject to the rules and regulations promulgated by the Secretary of the Interior. In the discretion of the said Secretary, any lease for oil or gas issued under the provisions of this Act shall be made subject to the terms of any reasonable cooperative unit or other plan approved or prescribed by said Secretary prior or subsequent to the issuance of any such lease which involves the development or production of oil or gas from land covered by such lease.
 SEC. 5. That the Secretary of the Interior may, in his discretion, authorize superintendents or other officials in the Indian Service to approve leases for oil, gas, or other mining purposes covering any restricted Indian lands, tribal or allotted.
 SEC. 6. Sections 1, 2, 3, and 4 of this Act shall not apply to the Papago Indian Reservation in Arizona, the Crow Reservation in Montana, the ceded lands of the Shoshone Reservation in Wyoming, the Osage Reservation in Oklahoma, nor to the coal and asphalt lands of the Choctaw and Chickasaw Tribes in Oklahoma.
 SEC. 7. All Acts or parts of Acts inconsistent herewith are hereby repealed.
 
 
 [5]
 The 1938 Act contains a general repealer. See Section 7 of the 1938 Act reproduced in footnote 4. Generally, the presence of a general repealer is not considered a strong indication that all prior law on the subject is meant to be repealed. 1A Sutherland Statutory Construction Sec. 23.08 (4th Ed.1972). In fact, a general repealer has been construed to imply "very strongly that there may be acts on the same subject which are not thereby repealed." Hess v. Reynolds, 113 U.S. 73, 79, 5 S.Ct. 377, 379, 28 L.Ed. 927, 929 (1885); Sutherland, supra, Sec. 23.08
 
 
 [6]
 But cf. Crow Tribe of Indians v. State of Montana, 650 F.2d 1104 (9th Cir.1981), amended, 665 F.2d 1390 (1982), cert. denied, --- U.S. ----, 103 S.Ct. 230, 74 L.Ed.2d --- (10/12/82). In Crow Tribe, this court held the Tribe had stated a cause of action in its suit to enjoin state taxation of the Tribe's non-Indian lessees of coal rights. In so holding, the court stated in dictum the 1938 Act "probably" repealed the prior leasing statutes, apparently including the 1924 Act and its tax authorization. 650 F.2d at 1112, fn. 10. For two reasons, we refuse to follow that conclusion. First, the 1924 Act's tax authorization applies only to oil and gas leasing, not coal, so this issue was not before the court. Second, Crow Tribe is a pleading case and any statements beyond those necessary to sustain upholding the Tribe's statement of a cause of action are dicta
 
 
 [7]
 In addition to being in a "patch-work state," some leasing statutes mandated following the general mineral leasing laws used on public domain lands. This procedure created "long delay and quite an expense to an applicant for a lease." Letter from Charles West, supra
 
 
 [8]
 We believe this arguable policy conflict in the 1938 and 1924 Acts is found primarily through the benefit of hindsight. While the intent of the 1938 Act makes clear the belief the tribes would be able to secure revenue through mineral leasing, we doubt Congress or the Department of Interior had any idea mineral resources on reservations would rise to the level of importance they have today. It is the current import of those resources which makes taxation such a critical issue at present. In our analysis of the 1938 Act, however, our primary emphasis must focus on the intent of Congress at that time, not on the present
 
 
 [9]
 While the 1924 Act, through its predecessor the 1891 Act, does not use the same language to describe the lands to which it applies as the 1938 Act, the 1924 Act has been construed to have had the same coverage as the 1938 Act. British-American Oil Prod. Co., supra, 299 U.S. at 164, 57 S.Ct. at 134
 
 
 [10]
 Judge Reinhardt concurs in the result, but was unable to participate in the preparation or approval of this Opinion