**BALL MEMORIAL HOSPITAL, INC.,**
**et al., Plaintiffs,**

**v.**

**MUTUAL HOSPITAL INSURANCE, INC., d/b/a Blue Cross of Indiana, and Mutual Medical Insurance, Inc., d/b/a Blue Shield of Indiana, Defendants.**

No. IP 84–1536–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 1, 1985.

Dutton, Kappes & Overman by Douglas B. McFadden, Indianapolis, Ind., for plaintiffs.

Kirkland & Ellis, by James W. Rankin, Chicago, Ill., Donald C. Trigg, Associate Gen. Counsel, Blue Cross/Blue Shield of Indiana, Indianapolis, Ind., for defendants.

## ORDER

STECKLER, District Judge.

Eighty acute-care hospitals brought this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. § 1337 to recover three-fold the damages sustained by Plaintiffs by reason of Defendants' alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and to obtain injunctive relief against threatened loss and damage by reason of such violations. The action was also instituted under Sections 1, 2, and 7 of the Indiana Monopoly Act, I.C. § 24–1–2–1, I.C. § 24–1–2–2 and I.C. § 24–1–2–7. By their complaint Plaintiffs also seek declaratory relief pursuant to Rule 57 of the Federal Rules of Civil Procedure on Defendants' alleged violations of I.C. § 16–12.1–3–11, I.C. § 16–12.1–1–1, *et seq.*, I.C. § 16–10–1–6.5, I.C. § 16–12.1–5–1, I.C. § 34–4–12.6–1(b), I.C. § 34–4–12.6–2, and I.C. § 27–8–11–3 and –4.

The matter is now before the Court on Plaintiffs' motion for preliminary injunction pendente lite seeking to enjoin Blue Cross/Blue Shield from implementing its Preferred Provider Organization in Indiana, to enjoin Defendants from advertising the Preferred Provider Organization and to enjoin Defendants' merger planned for March 1, 1985.

Defendants have developed and intend to implement, on March 1, 1985, a Preferred Provider Organization ("PPO") in the State of Indiana. The concept of PPO is to provide subscribers with incentives to use those providers of health care services who hold potential for reducing the rate of increase in health care benefit costs. Two key characteristics in combination differentiate PPO's from other forms of health care coverage: (1) subscribers are given incentives to use a limited panel of providers, but retain freedom of choice to use other qualified providers, and (2) preferred providers are defined by specific health care cost containment characteristics, such as competitive charges and participation in utilization control programs.

A hearing on Plaintiffs' motion for preliminary injunction commenced on February 7, 1985, and extended over a period of eleven days during which the Court heard testimony and argument regarding identification of the relevant product market, identification of the relevant geographic market, market power and market share, price shifting, patient steering, "discounts," and coercion. The record generated by the hearing contains hundreds of exhibits, affidavits, and depositions, and the transcript encompasses eleven volumes.

Plaintiffs contend that Defendants' purpose in offering the PPO is to exclude others seeking to offer a PPO from entering the market, to discourage major companies from self-insuring, to extract through coercion unreasonable discounts from health care providers, and to extend De-

fendants' market position. Plaintiffs' asserted purpose in initiating the action is to maintain the status quo, to continue the parties' longstanding relationship, and to preserve competition. Defendants on the other hand state that the PPO is being offered in response to consumer demands and represents another option for the consumer that should be made available in the market place. Defendants point out that participation in the PPO program is voluntary, but for those who choose the PPO option, defendants have established a network of hospitals which includes over 50% of the acute care hospitals in the state to provide participants with access to health care. Defendants claim PPO will enhance competition in the provision of health care financing and health care hospital services, and that what Plaintiffs are seeking is an anti-competitive injunction. It is Defendants' position that they are offering the PPO option to preserve, not extend, their market position.

While not singling out a particular facet of the evidence, in passing the Court would note the bargaining leverage Defendants are alleged to be able to employ by virtue of Defendants' advantageous position as the Medicare Intermediary and Rate Review Administrator in Indiana. Notwithstanding Plaintiffs' charges, the Court finds that Plaintiffs have failed to establish that Defendants have monopoly power or the ability to exclude others from the relevant market. For this reason and other reasons as set out in the Court's findings and conclusions the Court concludes that it must find for the Defendants and against the Plaintiffs on Plaintiffs' motions for injunctive relief.

Having considered the evidence, the briefs of the parties, together with the oral arguments, and being fully informed, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Defendants Mutual Hospital Insurance, Inc., d/b/a Blue Cross of Indiana, and Mutual Medical Insurance, Inc., d/b/a Blue Shield of Indiana ("Blue Cross/Blue Shield") are nonprofit Indiana corporations engaged in the business of offering health care insurance to Indiana residents. Blue Cross offers hospital care insurance; Blue Shield offers medical and surgical insurance.

2. Though technically separate, Blue Cross and Blue Shield have for more than thirty years acted as one company to offer health care in Indiana. Blue Cross/Blue Shield offers health insurance both to groups, such as employers who purchase on behalf of their employees, and to individuals who purchase for themselves. Blue Cross/Blue Shield also offers administrative services to companies in Indiana which have their own self-insurance programs.

3. Blue Cross and Blue Shield are nonprofit corporations. All of the revenue is used to pay claims and expenses. Any excess revenue is put in a statutorily required reserve to pay future claims, or returned to subscribers through refunds or reduced premiums.

4. Plaintiffs are eighty Indiana hospitals offering general acute-care hospital services. Many of the Plaintiffs are competitors in the market for hospital services.

5. On November 14, 1984 Plaintiffs filed their complaint asking for emergency relief to prevent the implementation of the Blue Cross/Blue Shield Preferred Provider Organization ("PPO"). Plaintiffs allege that, through its PPO, Blue Cross/Blue Shield is monopolizing or attempting to monopolize the market for health care financing and hospital services in violation of Section 2 of the Sherman Act. They also complain that the Blue Cross/Blue Shield Preferred Care Hospital Agreements are unreasonable restraints of trade in violation of Section 1 of the Sherman Act.

6. Plaintiffs' state antitrust claims are identical to their federal claims. In addition, Plaintiffs allege the PPO violates the Indiana County Hospital Statute, I.C. § 16–12.1–3–11, by requiring county hospitals to charge Blue Cross/Blue Shield a different price than they charge other patients.

Plaintiffs further allege that the PPO requires them to divulge rate review information protected by I.C. § 34–4–12.6–2. Plaintiffs seek monetary damages, declaratory judgment, and the extraordinary relief of a preliminary injunction.

7. On December 5, 1984, Defendants counterclaimed against Plaintiff-counterdefendant Methodist Memorial Hospital, alleging that Methodist, the Indiana Hospital Association, other hospitals and individuals acting on their behalf, have violated Sections 1 and 2 of the Sherman Act, and the Indiana Monopoly Act by their concerted actions in opposition to the Blue Cross/Blue Shield PPO. Defendants also allege that Methodist tortiously interferred with Blue Cross/Blue Shield's business relationships and prospective economic advantage. At this preliminary injunction hearing the allegations of the counterclaim are not properly before the Court for decision.

8. The relevant market in which Blue Cross/Blue Shield competes is the market for health care financing for consumers. Health care financing is a way for consumers to pay for their hospital and health care needs.

There is a high cross-elasticity of demand between the various products in the health care financing market, and there are no submarkets. Consumers are extremely price sensitive and will readily switch on the basis of price from one company or form of financing to another. Consequently, no competitor, including Blue Cross/Blue Shield, in the health care financing market has the power to control prices or exclude competitors. If Blue Cross/Blue Shield raised its premiums above competitive levels, customers would quickly abandon Blue Cross/Blue Shield in favor of alternative sources of health care financing. Competitors in this market can succeed only by offering quality and innovative products and services at attractive prices.

9. The relevant geographic health care financing market is regional, if not national. Indiana consumers are not confined by the states' boundaries in their purchases of health care financing. International and national insurance companies, regional insurance companies, and local companies all offer plans to Indiana residents. In addition, multi-state employers can shop for insurance programs nationally. Accordingly, there are no grounds for restricting the health insurance market to the boundaries of Indiana, and there are no submarkets.

10. There is vigorous competition in the health care financing market, and there are many competitors offering a wide variety of financing options to consumers. Consequently, Blue Cross/Blue Shield, as a seller of health insurance and administrative service, faces intense competition from other insurance companies, health maintenance organizations, administrative services only providers, third party administrators, and hospitals which operate preferred provider organizations. In addition to competing among themselves to win the accounts of their rivals, these entities compete for the business of companies which are self-insured. Finally, government programs such as Medicaid and Medicare are also significant factors in the market.

11. Entry barriers into the market for health care financing are extremely low. All that is needed to compete in Indiana, for example, is sufficient capital to underwrite the policies and a license from the Indiana Insurance Commissioner.

12. More than 1,000 companies are licensed to finance health care in Indiana; over 500 are actively selling such insurance. The competitors include companies like Prudential, Aetna, Metropolitan and Equitable, each of which have premium income and assets in the tens of billions of dollars and operate nationally. In addition, there are a number of health maintenance organizations in Indiana providing health benefits to thousands of people, and there is a strong movement both nationwide and in Indiana to form preferred provider programs as an additional health care financing option.

13. Like employers elsewhere, many of Indiana's employers, such as Eli Lilly, do

not use traditional third party insurance. Rather, they are self-insured, an increasingly popular alternative due in part to the development of a broad range of "administrative services only" ("ASO") contracts with third party administrators, data processing firms and others which can easily and quickly implement a wide variety of self-insurance programs. Under these contracts the third party administrator provides administrative services, such as claims processing, to companies who self insure and underwrite their own insurance.

14. In light of the dynamic character of the health care financing industry, a firm's share of premium revenues reflects no more than its ability to compete successfully in meeting consumer demands. Indeed, even measurements of premium revenues are misleading indicators of competition in the health care financing market because they fail to include revenues from sales of other competitive products such as ASO services, health maintenance organizations, and preferred provider programs. Both revenue statistics and patient population statistics similarly distort the nature of competition because they fail to account for the regional to national scope of the health care financing market.

15. The statistics do, however, demonstrate that Indiana hospitals have a wide variety of revenue sources, and that Blue Cross/Blue Shield faces vigorous competition in Indiana. This competition has in fact steadily eroded Blue Cross/Blue Shield's subscriber base over the last five years as Blue Cross/Blue Shield lacks the power to exclude other competitors from the market.

16. A preferred provider organization is a competitive option for financing health care that provides incentives for consumers to choose low cost hospitals. One form of a preferred provider organization is an arrangement between an insurance company and a provider of health care, such as a hospital.

17. The high cost of health care is a national concern. In 1968, health care costs were $57 billion and represented 6.7% of the GNP. By 1980, health care costs had risen to $247 billion and represented 9.4% of the GNP. By the end of this year, health care costs are expected to rise to $460 billion, accounting for 10% of the GNP. In Indiana, health care costs have far outpaced the national average, rising 24% for employers during each of the last three years.

18. Preferred provider programs contain costs by promoting price competition among hospitals and implementing prudent hospital utilization control. In a typical preferred provider organization, an insurance company (or other third party payor) and provider agree on the maximum price that the insurer will pay to that provider for services rendered to that company's insureds for the contract period. In return for that price stability the insurance company typically offers financial incentives for insureds to be treated at the "preferred" providers. Most preferred provider arrangements, like traditional arrangements between insurance companies and providers, specify steps for providers to take to minimize unnecessary use of the provider's facilities.

19. Currently in Indiana there are over a dozen operating or developing preferred provider organizations. Moreover, it is only a matter of time before many of the large national insurance companies which have preferred provider programs in other states market their programs in Indiana. Lincoln National Insurance Company and Equitable Life Assurance Company intend to set up a preferred provider organization in Indiana. Prudential Insurance Company, Humana Health Care, and other industry giants which also operate in Indiana, have recently set up experimental preferred provider programs in several states. PPO's are having a significant impact nationwide on the health care finance industry. The Directory of Preferred Provider Organizations published by the American Medical Care Review Association lists 141 preferred provider programs as of late 1984.

20. Many of the Plaintiffs in this case (and other hospitals) have developed or are developing their own preferred provider programs which they are marketing in competition with Blue Cross/Blue Shield. By thus offering financing arrangements to consumers to pay for hospital services, these hospitals are vertically integrating into the health care financing market and will be marketing their preferred provider programs in competition with Blue Cross/Blue Shield and other providers of health care financing. Plaintiffs who now have or soon will have their own preferred provider programs include St. Mary's Medical Center, St. Vincent Hospital, Methodist Hospital, Riverview Hospital, Winona Memorial Hospital, South Bend Memorial Hospital, and St. Margaret's Hospital. Plaintiff Hancock Memorial Hospital has joined with five other hospitals, which are not Plaintiffs, to form a preferred provider program known as the Pro-Health Network.

21. Methodist Hospital's preferred provider program (known as "MMA"), also scheduled to begin on March 1, 1984, is an example of a hospital's program. It is a joint effort by Methodist, Hendricks County Hospital, University Heights Hospital, Riverview Hospital, and Witham Memorial Hospital. As of November 1984 it included over 550 physicians and enrolled over 10,000 insureds. MMA functions like a typical provider-sponsored preferred provider program, and requires 5 or 10% discounts off physicians' usual and customary fees.

22. MMA vigorously marketed its product across the state and tried to encourage many of Indiana's largest employers, including Blue Cross/Blue Shield customers, to switch from their present form of health care financing to MMA.

23. Business leaders are in accord that preferred provider organizations have great potential benefits. The Business Roundtable, a group composed of the chief executive officers of more than one hundred of the nation's major corporations, estimates that business accounts for 25% of total health care spending. The Business Roundtable endorses preferred provider organizations as a way of using the incentives of market forces, rather than regulation, to generate more efficient utilization and more favorable prices.

24. In April 1984 the Indiana General Assembly passed P.L. 140–1984, Indiana's Preferred Provider Law, I.C. § 27–8–11. That law is designed to lower health care costs and specifically authorizes insurance companies to develop and operate preferred provider organizations in the state. Under the authority of that law, on July 30, 1984, Blue Cross/Blue Shield's presidents authorized the company to develop its preferred provider organization ("PPO").

25. Blue Cross/Blue Shield canvasses of Indiana employers found a number of them wanted the option of preferred provider programs for their employees. In response to this demand it developed its PPO product.

26. Consistent with the Indiana statute, Blue Cross/Blue Shield offered all 115 general acute care Indiana hospitals the opportunity to bid for membership in the PPO. All of the Plaintiffs, as well as nearly every other Indiana hospital, have signed Participating Hospital contracts with Blue Cross/Blue Shield, and thus are known as participating hospitals. When participating hospitals provide services to an insured, Blue Cross/Blue Shield pays that hospital directly for the insured's covered expenses in accordance with the charges determined by rate review; the hospitals bill the insured for any noncovered expenses. Since every hospital was given a chance to bid, the PPO is an "open-panel" program. Hospitals were not compelled to submit bids; their participation was purely voluntary. Ninety-one hospitals chose to submit proposals.

27. Blue Cross/Blue Shield did not demand discounts. For administrative reasons hospitals were requested to express their bids as a percentage of the hospital's October 1, 1984 rates. But hospitals were free to bid whatever price they wanted, and they did. The vast majority of the ninety-one proposals Blue Cross/Blue Shield re-

ceived were higher than the hospitals' October 1, 1984 rates.

28. After receiving the proposals, Blue Cross/Blue Shield began individual negotiations with each hospital over the level of the hospital's proposed rate. How rates were ultimately determined was each hospital's unilateral business decision after arms-length negotiations with Blue Cross/Blue Shield. Each hospital remained free to charge any of their other customers, such as other PPO's or commercial insurers, whatever price it wished.

29. On January 21, 1985, Blue Cross/Blue Shield entered into Preferred Care Hospital Agreements with sixty-one of the hospitals located throughout the state. The Preferred Care Hospital Agreements specify the prices to be charged all Blue Cross/Blue Shield insureds during the remainder of 1985. The contracts will be renegotiated prior to expiration, and any preferred hospital can terminate the contract at the term's end if satisfactory prices cannot be agreed upon. The agreements also specify certain steps for the hospitals to take to minimize medically unnecessary use of their facilities. These utilization controls, developed originally by an independent research company, are widely accepted and have been used by the federal government in the Medicare program.

30. Blue Cross/Blue Shield selected the preferred hospitals for its PPO network after an analysis and inquiry of each proposal submitted. In making its selection Blue Cross/Blue Shield used objective criteria to identify the hospitals offering quality care at competitive prices conveniently located for Blue Cross/Blue Shield's insureds.

31. Blue Cross/Blue Shield will market its preferred provider product to employers and individuals throughout Indiana. Through reimbursement incentives, the PPO will encourage insureds to seek treatment at its preferred hospitals. The anticipated standard policy will provide that Blue Cross/Blue Shield will pay 100% of covered expenses whenever a preferred hospital is used and some lesser percentage, such as 75%, when a participating hospital is used. When a participating hospital is used by an insured covered by the PPO, the insured will be responsible for paying the hospital the difference, if any, between what it charges and what Blue Cross/Blue Shield pays.

32. Because of the anticipated lower costs of utilizing preferred hospitals, Blue Cross/Blue Shield expects to offer lower premiums to new customers and potential customers who purchase the preferred provider product. Blue Cross/Blue Shield estimates that the PPO will enable it to reduce premium charges to its PPO customers between 10–20% in 1985.

33. Blue Cross/Blue Shield has announced that it will solicit physicians to join its PPO. Physicians will be asked to agree to admit patients with PPO coverage, wherever possible, to preferred hospitals and to help reduce unnecessary costs by using various utilization controls. Blue Cross/Blue Shield will identify those physicians to insureds as preferred providers and will pay them in full, under its usual, customary and reasonable policies, for covered services.

34. The Blue Cross/Blue Shield PPO does not prevent any hospital from participating in any other preferred provider program, or from establishing its own such program. To illustrate, Plaintiff Riverview Hospital is already a member of three PPO's: the Blue Cross/Blue Shield PPO, the MMA, and the Pro-Health Network.

35. In implementing its PPO, Blue Cross/Blue Shield first wrote every hospital in the state, explaining that the PPO would be announced, and expressing the hope that its "close relationship" with Indiana hospitals would continue. It wrote to the heads of every professional medical association in Indiana enclosing complimentary copies of the original Request for Proposal. Blue Cross/Blue Shield met with employees from numerous hospitals to explain the PPO, the proposal process, and to answer any questions. It held a comprehensive question and answer program for all hospitals, and then prepared and distrib

uted further written responses to over 100 questions posed by the hospitals.

36. As a result of hospital feedback, Blue Cross/Blue Shield amended the Preferred Care Hospital Agreement in several significant respects. It deleted an indemnification provision in the Agreement; it revised a list of Outpatient Ambulatory Surgical Procedures; it added a provision allowing hospitals to bill insureds for noncovered, nonhealth services; and, it clarified the utilization review appeal procedure. The Outpatient Surgical Ambulatory Procedures list is a utilization control which specifies the procedures which have to be performed on an outpatient basis in order to qualify for reimbursement from Blue Cross/Blue Shield. Blue Cross/Blue Shield worked on this list in close consultation with physicians to be sure that the procedures could be safely and effectively performed on an outpatient basis. Blue Cross/Blue Shield also circulated the list to various surgical societies in Indiana before finalizing it, and revised the list to accommodate concerns of Indiana hospitals, and others.

37. Since these amendments changed the terms of the PPO, Blue Cross/Blue Shield reopened the Request For Proposals ("RFP") to allow hospitals which did not previously submit proposals to do so.

38. To prepare to implement the PPO, Blue Cross/Blue Shield has developed insurance packages containing the PPO product and presented these packages to customers and potential customers directly and through mass media advertising. It put the mechanisms in place for the PPO to become operational, conducted actuarial studies, developed its program for making doctors and other health care providers part of the PPO, and set up a PPO organization in-house. It has obtained the necessary approval from the Indiana Insurance Commissioner.

39. As a result of these efforts, the Blue Cross/Blue Shield PPO will be ready on March 1, 1985. The product has the potential to save Indiana consumers millions of dollars in health care premiums.

The PPO's utilization controls and procedures are intended to generate savings by eliminating needless in-patient admissions and unnecessary operations. The PPO's incentives that encourage patients to choose lower priced hospitals are intended to further reduce the public's health care bill.

40. The product market for hospital services consists of a cluster of health care services delivered in a hospital setting. Blue Cross/Blue Shield does not now and has never competed in this market. Rather, it is a buyer of hospital services for its insureds.

41. The relevant geographic hospital services market is localized, generally on a county basis, and the barriers to entry are substantial.

42. As one of many purchasers of hospital services, Blue Cross/Blue Shield's effect on the market is measured against the aggregate of all hospital revenues received from selling all in-patient and out-patient services to all consumers—including Medicare/Medicaid, HMO's, vertically integrated PPO's, self-insured plans, other commercial insurers, Blue Cross/Blue Shield, and all other consumers of hospital services.

43. If a preliminary injunction were issued, it would prevent Blue Cross/Blue Shield from offering its competitive PPO product to the market. The public would be injured, and would forfeit the benefits of competition and the opportunity for decreased health care costs. Competition would be restrained in the health care financing market because Blue Cross/Blue Shield cannot offer its product to the public, who thus would have their available options of health care financing reduced. Competition would also be restrained in the hospital services market because hospitals would not have to compete against one another on the basis of price for Blue Cross/Blue Shield insureds. In addition, the public would lose the improved hospital utilization control which the PPO would sponsor.

44. If an injunction were entered, Blue Cross/Blue Shield would also be injured. It would lose its substantial investment of time, money and resources in preparing the PPO for a March 1 implementation. It would lose some of its major accounts who expected the PPO to be available, and lose the ability to compete for other potential accounts through the PPO.

45. Denying an injunction would not cause any efficient hospital to go out of business. Through its PPO, Blue Cross/Blue Shield asked hospitals to offer their best price for Blue Cross/Blue Shield's purchases of hospital services for its insureds. If a hospital bid prices below its cost, that choice was the hospital's independent business decision and not a basis for legal redress.

46. Denying an injunction would not cause hospitals to shift costs to non-Blue Cross/Blue Shield insureds. Plaintiffs' theory of "cost-shifting" is without merit. It refers to the common phenomenon of a seller charging different prices to different customers. Far from signifying "anti-competitive behavior" on the part of the buyer, it simply reflects the seller's decision and ability to charge different buyers different prices.

### Conclusions of Law

■ 1. Granting a preliminary injunction is the exercise of an extraordinary power not to be indulged in except in cases clearly warranting it. *Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Products, Inc.*, 545 F.2d 1096, 1097 (7th Cir. 1976). This is not such a case.

■ 2. To be entitled to a preliminary injunction, Plaintiffs have the burden of showing:

(a) that granting the requested injunction will serve, not disserve, the public interest;

(b) that the threatened injury to Plaintiffs outweighs the threatened harm an injunction may inflict on Defendants;

(c) that Plaintiffs have no adequate remedy at law and will be irreparably harmed if an injunction does not issue, and

(d) that Plaintiffs have a reasonable likelihood of success on the merits. *Technical Publishing Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1138 (7th Cir.1984); *Dos Santos v. Columbus-Cuneo Cabrini Medical Center*, 684 F.2d 1346, 1349 (7th Cir.1982).

■ 3. Buyers, such as Blue Cross/Blue Shield in this case, are the intended beneficiaries of the antitrust laws. *See Kartell v. Blue Shield of Massachusetts, Inc.*, 749 F.2d 922 (1st Cir.1984); *Quality Auto Body, Inc. v. Allstate Insurance Co.*, 660 F.2d 1195 (7th Cir.1981), *cert. denied*, 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982).

■ 4. Anything that prevents or suppresses competition among sellers for the business of the buyer has an anti-competitive effect. The requested preliminary injunction would have an anti-competitive effect on buyers of health care financing, such as employers, groups and individuals, and on buyers of hospital services, such as Blue Cross/Blue Shield.

5. If an injunction were entered the harm to the public would be substantial and would outweigh the harms, if any, which Plaintiffs are likely to suffer as a result of this denial of the preliminary injunction.

6. If an injunction were entered, Blue Cross/Blue Shield would be subjected to the risk of losing major accounts, such as General Motors and U.S. Steel, to other providers of health care financing which have PPO options.

7. Similarly, Blue Cross/Blue Shield could suffer significant damage to its reputation as an innovative, progressive provider of health care financing. In light of all Blue Cross/Blue Shield's public promotion of its PPO, a failure to deliver on promises of timely implementation could cause significant customer antagonism.

8. An injunction would restrain Blue Cross/Blue Shield from competing with Plaintiffs and others through its PPO and

would give competing PPO's a head start in the market.

9. Finally, Blue Cross/Blue Shield would forfeit most of its significant investment in its PPO if its implementation were enjoined.

10. A preliminary injunction would further reduce price competition between Indiana hospitals, and would thwart Blue Cross/Blue Shield's attempt to implement widely accepted utilization controls.

11. If an injunction were entered, the harm to Blue Cross/Blue Shield could be substantial and would outweigh the harms, if any, which Plaintiffs are likely to suffer as a result of this denial of the preliminary injunction.

12. Plaintiffs have failed to demonstrate that any injuries they will allegedly suffer as a result of the timely implementation of the Blue Cross/Blue Shield PPO are irreparable and that they have no adequate remedy at law.

13. To constitute irreparable harm the threatened injury must be, in some way, "peculiar." *E.g., American Hospital Association v. Harris*, 625 F.2d 1328, 1331. Claims of injury should be based on more than mere speculation. *E.g., Associated General Contractors v. California State Council*, 459 U.S. 519, 542, 103 S.Ct. 897, 911, 74 L.Ed.2d 723 (1983); *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203, 218 (9th Cir.), *cert. denied*, 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974).

14. Plaintiffs must show that they have a reasonable likelihood of success on the merits. *Signode Corp. v. Weld-Loc Systems, Inc.*, 700 F.2d 1108, 1111 (7th Cir.1983). However, where there is a clear imbalance in the harms to the respective parties, the plaintiff need only show that he has raised a "substantial question on the merits," or that his chances of success on the merits are "better than negligible." *General Leaseways, Inc. v. National Truck Leasing Ass'n*, 744 F.2d 588 (7th Cir.1984); *Roland Machinery v. Dresser,*

*1984–2 Trade Cases*, ¶ 66,175 (CCH) (7th Cir.1984).

15. Plaintiffs have no reasonable likelihood of success on their claims, nor have they raised a substantial question or have a better than negligible chance of success on the merits.

16. The weight of authority holds that a contract that sets the price for services between a buyer such as Blue Cross/Blue Shield and a seller such as a hospital is neither *per se* unlawful nor an unreasonable restraint of trade. *E.g., Kartell*, 749 F.2d at 924–929; *Pennsylvania Dental Association v. Medical Service Association*, 574 F.Supp. 457 (M.D.Pa.1983), *aff'd*, 745 F.2d 248 (3d Cir.1984); *Royal Drug Co. v. Group Life & Health Insurance Co.*, 737 F.2d 1433 (5th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 912, 83 L.Ed.2d 925 (1985); *Klamath-Lake Pharmaceutical Association v. Klamath Medical Service Bureau*, 701 F.2d 1276 (9th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 88, 78 L.Ed.2d 96 (1984); *Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Connecticut, Inc.*, 518 F.Supp. 1100 (D.Conn.1981), *aff'd per curiam*, 675 F.2d 502 (2d Cir.1982); *Quality Auto Body*, 660 F.2d 1195; *Proctor v. State Farm Mutual Insurance Co.*, 675 F.2d 308 (D.C.Cir.), *cert. denied*, 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982); *Webster County Memorial Hospital, Inc. v. United Mine Workers of America Welfare & Retirement Fund of 1950*, 536 F.2d 419 (D.C. Cir.1976) (per curiam); *Travelers Insurance Co. v. Blue Cross of Western Pennsylvania*, 481 F.2d 80 (3rd Cir.1973); *Brillhart v. Mutual Medical Insurance, Inc.*, No. IP 83–1133–C (S.D.Ind., July 16, 1984), *appeal docketed*, No. 84–2259 (7th Cir., July 30, 1984); *Feldman v. Health Care Service Corp.*, 562 F.Supp. 941 (N.D.Ill. 1982); *Sausalito Pharmacy, Inc. v. Blue Shield*, 544 F.Supp. 230, 235 (N.D.Cal. 1981), *aff'd per curiam*, 677 F.2d 47 (9th Cir.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 510 (1982).

17. Because the same elements must be proved to establish a violation of the Indi-

ana Monopoly Act, I.C. § 24–1–2–1, as must be proved to establish a violation of the Sherman Act, § 1, or § 2, *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704 (7th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980), there need be no separate discussion of Plaintiffs' state antitrust claims. Those fail along with their Sherman Act claims.

18. To prove monopolization Plaintiffs must show Blue Cross/Blue Shield possesses monopoly power within a relevant market and willfully acquired or maintained that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

19. To prove attempt to monopolize Plaintiffs must show that Blue Cross/Blue Shield specifically intended to monopolize, engaged in predatory conduct directed toward accomplishing the monopoly, and has a dangerous probability of achieving monopoly. *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *General Business Systems v. North American Philips Corp.*, 699 F.2d 965, 975 (9th Cir.1983).

20. Monopoly power is the power to control prices or exclude competitors. *United States v. DuPont*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956).

21. Blue Cross/Blue Shield does not have monopoly power in the health care financing market. Because of the number, size, and variety of competitors and competing plans, Blue Cross/Blue Shield cannot control prices as customers could immediately select alternative financing arrangements in response to any price increase above competitive levels. *General Business Systems*, 699 F.2d at 972.

22. Blue Cross/Blue Shield's attempt to compete vigorously in the health care financing market through its PPO is not predatory nor does it establish an intent to monopolize. *United States Steel Corp. v.*

*Fortner Enterprises*, 429 U.S. 610, 613 n. 1, 97 S.Ct. 861, 864 n. 1, 51 L.Ed.2d 80 (1977); *White & White, Inc. v. American Hospital Supply Corp.*, 723 F.2d 495, 507 (6th Cir.1983).

23. Because of the size of the regional and national health care financing market, the size of Blue Cross/Blue Shield's competitors, and the wide variety of alternative forms of health care financing, there is little likelihood that Blue Cross/Blue Shield could obtain a monopoly in the health care financing market.

24. Blue Cross/Blue Shield cannot, as a matter of law, monopolize or attempt to monopolize the hospital services industry because Blue Cross/Blue Shield has never and does not now compete in that market.

25. Blue Cross/Blue Shield PPO cannot coerce unfavorable contract terms, cause cost-shifting or force price discrimination from a preferred hospital. All pricing decisions are within the exclusive business judgment of each hospital. *Sausalito Pharmacy, Inc.*, 544 F.Supp. at 238 n. 2; *Kartell*, 749 F.2d at 924–929; *Travelers Insurance Co.*, 481 F.2d at 82, 84–85.

26. Indiana's Preferred Provider Law specifically pre-empts any conflicting statute, and any claim based on an alleged conflict with another statutory provision is facially defective. *Burks v. Bolerjack*, 427 N.E.2d 887, 890 (Ind.1981).

27. The PPO does not compel any hospital to price discriminate in violation of the County Hospital Statute. County Hospitals may join the PPO and charge all patients the same price they bid to Blue Cross/Blue Shield.

28. The PPO does not require preferred hospitals to breach any peer review confidence under I.C. § 34–4–12.6–2.

29. The merger of Defendants will not irreparably alter the market structure in the prepaid health insurance and hospital services in the State of Indiana and will not be anti-competitive.

By reason of the foregoing Plaintiffs' motions to enjoin Defendants from imple-

menting its Preferred Provider Organization and from merging are hereby DENIED.

IT IS SO ORDERED.